United States v. Phillips All right, Mr. Hecker, you are served two minutes for rebuttal. You can begin whenever you're ready. Thank you, Your Honor, and may it please the Court. Sean Hecker for Appellant Neil Phillips. Neil Phillips was charged and convicted for making bona fide trades, assuming real risk opposite willing counterparties. The trades for which he was charged were consistent with market expectations and practice. Indeed, they were consistent with and nearly mirror images of the trades of the alleged victim, in this case, Morgan Stanley. All of Mr. Phillips' trades were in the foreign exchange spot market, a decentralized market that Congress has long exempted from regulation, and none of the trades was made in the United States. Mr. Phillips traded from South Africa through a salesperson from a Japanese bank who happened to be located in Singapore. The District Court recognized the novelty of the government's theory and the difficult issues presented, but ultimately erred in multiple crucial respects. First, the case dispositive instruction it created for Section 2i misstated the requirement for a significant connection to activities in U.S. commerce, and even under that mistaken instruction, the evidence at trial was insufficient to meet it. The consequence for concluding otherwise is clear. If the connections with U.S. commerce in this case were sufficient for the Commodities Exchange Act to apply it extraterritorially, then it would be only the very rare case when they are not. Can I ask you, Mr. Hecker, on that issue, I want to have a brief discussion of whether we're on the plain error review or not. Your argument is that the District Court erred because it should have instructed that the jury had to find a systemic risk to the United States financial system, yes? Correct. So, you can correct me if I'm wrong. I know there's a lot of back and forth on the briefs on this, but Judge Wyman received the proposed instruction on the morning jury selection, comes out with a charge that he says he has an open mind about, and the instruction on extraterritoriality is blank. He says, we're still working on that, we don't have that yet, and so for the first time ever in this case, as it relates to the judge, he presents his instruction on this at the charge conference, and there's no objection, you can see there was no objection to that instruction at the conference, right? Well, here's what happened. The judge said that he was asking for whether there were any objections beyond those that had already been made. We proposed the systemic risk instruction for Section 2i. Where did he say in the charge conference, I want any objections that haven't already been made? I didn't see that in the charge conference. So what the court said was that he had pulled the significant language with respect to the in connection with Prong from the government's brief in Morrison, I believe that's at Appendix 1379, and then he said, are there any objections to any of the new language that I've added to the instructions that have not already been raised? That's at the court saying to the parties, if you have something new to bring to my attention, please do so. I've been trying cases, I was fortunate to have tried the case below. I've been trying cases for 25 years. There is no doubt in my mind that Judge Lyman understood that our view was that the appropriate instruction for Section 2i, whether under the effects strong or the in connection with Prong, had to be systemic risk. We argued it in a pretrial motion to dismiss. We briefed it. He didn't argue it in a pretrial motion to dismiss. He just said this is something that's going to be, he made no ruling with respect to that. Absolutely correct, Your Honor. And then we briefed it pretrial at the district court's instruction. There's a lot of case law out there that suggests that whatever briefing goes on, things happen at trial, things develop at trial, and you know this, you've been practicing for a long time. At the charge conference, I understand you're suggesting that he somehow said all your objections are preserved by that comment, but absent that, you would agree 100% with me that you have to raise it at the charge conference, correct? You do. Your Honor, this was the unusual case where we effectively had the charge conference before the charge conference because we told the judge that there were case dispositive issues, both extraterritoriality and intent, that were necessary for us to understand before we opened. The judge reserved on extraterritoriality after hearing argument, but we argued this issue extensively. How do you take from the term significant connection that that requires a systemic risk to the financial system? That seems just based upon the term significant to be a large jump. It is by, let me say this. The word significant can mean almost anything. It's in which it's used. And in analyzing Section 2I, you have to look at Dodd-Frank's structure, context, history, and purpose. Congress added Section 2I in the aftermath of the financial crisis, and the entire structure and purpose of Dodd- Frank and of 2I is to address systemic risk. It's plain in the purpose of the set out at length in our brief. They capture activities that are necessary to address systemic risk, and they exclude activities that are not. Why else would Congress exempt de minimis swap trading activity that otherwise does not pose such a risk to the system? It's because they're not significant for purposes of Dodd-Frank. And more importantly... Does that purpose of the statute, though, mean that de minimis is de minimis, right? It's sort of its own universe. But that each individual act has to undermine the stability of the system and pose a risk to the system? Or can it mean that these types of activities, if they are generally allowed to go on, pose a systemic risk? I think if you were to adopt that approach, which is effectively the approach the government argues here, you would read out of the requirement any independent meaning for significant, and you would do real violence to the presumption against extraterritoriality. The presumption against extraterritoriality means that you have to construe any ambiguity in the statute in favor of a more restrictive reading of the extraterritorial application. If you were to adopt an aggregation approach, you would sweep in all foreign swaps if, as a category, they can be significant. That's not what Congress did here. And if they wanted to do that here, they could have said it. As long as they had a direct and significant connection to the United States, right? Well, there are two different problems. One is... If the client is in South Africa and nothing touches upon the United States, wouldn't you do that? It's almost impossible in this market not to touch the United States. Why? But that's why I disagree with you that it reads out the word significant. And, by the way, it can't, or else your second argument wouldn't work, right, that the evidence here was insufficient to be significant. Significant is meaning and direct. Those are both meaningful terms, and they have real meaning in this statute. And, you know, it could be a pretty high standard. I'm not sure why that would eliminate what Judge Bianco points out, the significant and direct requirement. I see that my light has expired. May I answer the question? Carry on. So there's ambiguity in what significant means. Our position means is that you have to understand it in light of the purpose of Don Frank and the limited way in which Congress said we are going to have some extraterritorial reach for this statute. It can't be that the reading of that is all swap activity. That would be completely inconsistent with the purpose of this provision and do great violence to presumption. And it can't be, as Judge Bianco suggested, all swap activity with a direct and significant connection to the United States. Well, it depends. To be very clear, what Judge Lyman instructed was a little different. What Judge Lyman said construed significant to mean integral to the swap rather than significant to the commerce in the United States. Well, that's not really, that's not fair. He said multiple times significant to the United States. The integral was just a weighter mischarge. Understood. Let me just ask you about the evidence. Sure. Assuming we disagree with you on the definition, here the government points to the fact that Morgan Stanley was the counterparty. They bought the risk from the option in the United States after the false signal, which, again, I know Judge Lyman said that that wasn't enough in itself, the false account. It's really important who the they is in that sentence, Your Honor, in that question, because the government suggests in its brief it's Morgan Stanley. In this case, the payment was made by Morgan Stanley International, which was the swap counterparty. That's clear in the record from the swift instruction that is in the record. That's at the appendix at 2841. Was it paid from its New York bank account? The fact that there's a New York bank account is of no moment. It's entirely incidental. And let's be really clear what the evidence is, because in this case, the only evidence that Morgan Stanley in the U.S. had any involvement was the completely fortuitous indirect fact that there was testimony from someone who was not involved in the transaction at Morgan Stanley in the United States who said as a enters into a trade like this, we enter into a back-to-back transaction with Morgan Stanley Capital in the United States because we want to manage our book globally from New York. That's what the testimony was. But there's no evidence in the record of any back-to-back contract. It's not in the record. There's no evidence of what happened with respect to such a contract if there was one. There's no evidence, for example, if it was unwound before this trade happened. J.P. Morgan, your client used them as the prime broker for the option. Yes or no? They used J.P. Morgan as prime broker, period, full stop, in the United Kingdom. Yes. That, however, Your Honor. Did he receive and make payments under the option from bank accounts with J.P. Morgan, prime brokerage in New York? Your Honor, the question is not whether it touched the banking system of New York. The question is whether it had a direct and significant connection with activities in U.S. commerce. The prime brokerage relationship in London with Glenpoint is not a significant one in connection with the swap activity. It is a riskless principle when they're acting as prime broker. It is an administrative function. They hold collateral that is an amount greater than the amount of the trade, and they're not putting their own capital at risk. We should focus only on Morgan Stanley. We should focus only on Morgan Stanley. Yes, and the problem with Morgan Stanley, putting aside significant, is it's by definition not direct. The direct relationship is with the swap counterparty in the United Kingdom. The U.S. piece is entirely secondary, incidental, and indirect by definition. And, in fact, Judge Lyman recognized that in the oral argument on Rule 29, but in his opinion, he suggested it was key because it had to have happened based on the testimony from the one witness. Can I ask you, you said something about J.P. Morgan having no obligation. The government argues that if Morgan Stanley failed to pay, they would take on the obligation to pay if the option was triggered. Is that incorrect, that J.P. Morgan would then take on the obligation? As a formal technical matter, there's a credit agreement in place that is over collateralized by Glenpoint. In connection with its broad prime brokerage relationship, J.P. Morgan had no risk. J.P. Morgan was never presented as a victim in this case. They weren't notified as a victim in this case. It had no meaningful impact on J.P. Morgan, period, full stop. If it was direct, it couldn't possibly be significant if you give any meaning to the word significant. It's just factually inaccurate. And anyone who operates in this market and understands the role of a prime broker knows that. So Morgan Stanley, at least there's a connection in the sense that they entered into the swap as the counterparty with Glenpoint indirectly. But that's the U.K. entity. The U.S. entity is an add-on after the fact that had nothing to do with the prime trade, and we know nothing about any money movements in connection with that contract. If it exists, it's not in the record at all. All right. Thank you, Mr. Hacker. We'll hear from the government. Mr. Burnett. May it please the Court. I'm Tom Burnett. I represent the government on appeal, and I represented the government at trial in this case. Mr. Phillips, the defendant, was convicted of trading to intentionally manipulate a global foreign exchange rate with the specific purpose of deceiving a counterparty to a one-touch option. His conduct was regulated by the Commodities Exchange Act because he was trading in that spot market with the specific purpose of manipulating a spot, and his conduct is properly regulated in the United States because the two most important parties that were opposite him in that swap were both American financial institutions, and his conduct was directly and significantly related to the conduct of those institutions in the United States. Both equally? Both equally? Yes, Your Honor. I think both equally. And I want to start with J.P. Morgan. The point that Mr. Hacker made that J.P. Morgan, the prime brokerage relationship within London, was simply factually incorrect. Essay 411 of the record shows Glenn Point's documents where they say that J.P. Morgan, the New York entity, is its prime brokerage relationship, and there was extensive evidence, including records from J.P. Morgan in the United States, showing that Glenn Point's prime brokerage relationship was with that New York entity. That's important because it means that there's a relationship between Glenn Point and J.P. Morgan, United States. That is where the connection is. Would it have been enough if that was the only one? I think it would have been enough if it was the only one because that is the direct counterparty to Glenn Point on the option. So when the false price signal happens, the party that is directly obligated to pay Glenn Point, as the district court observed, is J.P. Morgan. That's who the contract is with. So they are partly one of the ones being deceived, and the money goes from J.P. Morgan, partly through their New York account, to Glenn Point's New York bank account as well. So that's that relationship that's happening with one foot in the U.S. There is a London connection to J.P. Morgan. So on the J.P. Morgan side, the money starts in London, goes through the New York account, and then comes to the New York account of Glenn Point. That's Maria Silvera's testimony at pages 500 and 501 of the transcript. But I think what's important there and what the district court observed is the U.S. entity of J.P. Morgan is not the relationship of a subsidiary to a parent. Rather, the particular way that J.P. Morgan has set up its business, the London office is a branch, which means that it is legally a part of the U.S. entity. And I know this sounds a little technical, but it's actually critically important for the way that the CEA operates, because when a foreign entity is set up as a branch as opposed to a subsidiary, its risk sits with that U.S. entity, and it's considered part of the U.S. entity. So that's why those swap contracts that J.P. Morgan has with Glenn Point in this case say that this is a contract with the U.S. entity in the footnote on the bottom. A little off point, but it has to do with a word or two that you had in there. Is this all, I assume this was all part of the charge to the jury, right? So the phrase direct and significant and the meaning of those terms were part of the charge to the jury. They had to understand what that meant. They had to understand what the terms direct and significant meant? That's correct. The irony is that here we are having three judges, and you're trying to explain to us what it means. And then we have to defer to a jury who are not legally trained, and there are times when you kind of wonder about that. It's not your fault. It's not my fault whether there's an irony there that we're deferring to a jury who must have had one hell of a time understanding that Judge Lyman wasn't talking English. So I think there's two things, Your Honor. First, we commonly ask juries to handle difficult factual situations. I don't think there's anything problematic with that. But more importantly, I know we're focused here on J.P. Morgan and Morgan Stanley, but it is important not to lose sight of the bigger picture here, which is that this entire fraud scheme straddled the United States. And the reason it did was because it was part of Glen Point's business, which was partly in the United States with American prime brokers, American clients, American bank accounts, registered entities in the United States. This was no surprise to anyone that the case was brought in the United States against a registered entity with the United States. So I think contextually there was a lot more for the jury to put its hands on. I don't understand the whole nature of this industry. Mr. Tucker's point is that if this is the legal standard and this evidentiary showing is sufficient to satisfy that, that every trade is going to have extraterritorial application. True or not true? Not true. It has to have a direct and significant connection to the United States. But nowadays, if the money moving through Wall Street basically is enough, it sort of feels like in this interconnected, internationalized world, where so much of the financial hub of the world is here, it's pretty hard to do any meaningful, we're talking hundreds of millions of dollars, right? So once you get into the tens of millions and hundreds of millions of dollars, it's pretty hard to do that without touching New York. So I think a couple of things. So first, I think practically it's actually not that difficult to do without touching New York. So, for instance, there are foreign exchange or hedging transactions or swaps that are done all the time by European businesses with European banks. There's no reason for that. You're thinking Morgan Stanley, thinking it was Europe, Morgan Stanley. And Morgan Stanley then, this is the allegation, right, is that it transferred the risk to its New York base. How do you know that's not going to happen? And then that's one of the factors that plays into it being significant and direct to the U.S. How can someone working in the markets, how can they know, how can they even have any belief that they're going to avoid coverage by the CEA no matter where they do this? So I think an important line that the District Court drew here is it's not that just any incidental contact to the United States or the fact that a wire happens to get routed through here or someone happens to have a relationship with the U.S. bank that matters. Rather, what the work that's significant does and why it makes a difference here is that the whole point of this fraud scheme is to trick whoever is on the other side of the option into paying you out. And in this case, the folks who were on the other side of the option were J.P. Morgan directly. The victims are American companies is the argument. Exactly. That's the line I think is important. So you could have counterparties that are outside the United States for these options, right? Sorry? You could have counterparties to these options that are outside the United States that are not American banks? It's possible that, yeah, exactly, like a BNP Paribas or some foreign entity could be on the other side of the option. What about prime brokerage services? Could those be provided by entities outside the United States or not? They could. Glen Point made the decision to use J.P. Morgan's U.S. entity here to be the prime broker, and that is its prime brokerage relationship, which also goes to the point about this is not a surprise here. Glen Point and Mr. Phillips decided to have important parts of their business in general and their business with respect to this particular fraud to have one foot in the United States. And on the point about I think the concern of the court should not be that this is going to be the CEA run wild because this is the way the CEA has been interpreted since Dodd-Frank was enacted. Rather, the real danger is that the court imposes a very cramped definition of 2I, like the defense is advocating for, and effectively blows up a significant regulatory scheme that has developed over the last 15 years. I think on the systemic risk point, as these dovetail together, it's important to know that Congress, the agency industry, there's no evidence that any of them have ever proposed or operating on the understanding that the systemic risk standard is the way to think about applying 2I abroad. Instead, they've all operated on the basic framework that the CFTC has proposed in both its guidance and its rulemaking, which is that there needs to be a direct, but direct, using the way that term is defined in the FTAIA, so a reasonably approximate causal nexus to the United States. Can I just ask you on the plain error issue as it relates to extra territoriality? The argument here is, you heard Mr. Hector, they briefed it. They proposed the instruction. They briefed it. There was oral argument about it. And then the charge conference happens, and I don't have what he read in front of me, but Judge Lyman says, are there any objections that haven't been raised? Why isn't that enough? So I think it's not enough because the question on a jury instruction for plain error is you have to object at the charge conference unless it's futile. And the only way it's futile is not whether you've raised it before, but whether under grote the district court has clearly manifested an intent to reject the instruction. But if the district court says at the charge conference, and again, he read it, that you have any other objections that you haven't made? Isn't the district court indicating I've made up my mind on the ones you've already raised? But my understanding is that reference, the reference they cite in the brief, was at the charge conference at the beginning of the case when there was no instruction on extra territoriality here. And what I think is actually important, and this is something we could supplement the record on if this is a point you're interested in, when the district court circulated its instructions on October 21st that added the extra territoriality instructions for the first time, it included a cover email that said counsel should be prepared to discuss the instruction on the requisite relationship to the United States on Monday, Monday being the charge conference. So when the district court sent those extra territoriality instructions, it sent an email saying everyone should be ready to talk about these. So if there's any indication that the court had an open mind on these instructions and wanted to talk about them, it was right in the cover email the first time he gave those extra territoriality instructions. But on the sole intent issue where during the trial when they tried to offer evidence, and there's a whole discussion about we need to show sole intent, Judge Lyman said you're arguing with me about my charge, I've already, this is the charge I'm going to give, and I'm not letting that evidence in. That's pretty clear that he's made up his mind, at least on that one, right? So I think to be fair, it is a clear reference to the instruction on that point, but I would point the court to... He's saying I've made up my mind essentially on that one, right? But the Hunt decision I think is the one that's analogous here where this court explicitly said that an exchange in the context of objection to testimony isn't sufficient to preserve an error for the jury instructions even if there's a relationship between those two things. So I think this court has already held that that type of mid-trial exchange where there's a lot of things going on before the jury comes in... It's a very specific thing that this is the instruction I'm going to give. I think I was on that Hunt panel, and I don't remember that part of it. Just because you make an evidentiary rule doesn't mean you've rejected a charge, except when you say, this is the charge I'm going to give. Stop bothering me. They didn't say that. That's me. That's fair, Your Honor. And to be clear, I don't think we particularly need plain error on either of these issues for the court to affirm. I'm happy to address sole intent if that would be helpful, but I see my time has passed up as well. I'll give you one minute. I'll get Mr. Heckert to get a chance to talk about sole intent. I'll give him an extra minute to do that, but do it in one minute. So on the sole intent instruction, I want to make two points here, which is, first, that the district court gave an appropriate instruction that, in fact, set a higher bar than the law required. This court in Valley, Set, Capital, and Royer has affirmed jury instructions and articulated the law of manipulation as trading plus manipulative intent is sufficient to state a claim for manipulation. The district court's but-for test was a meaningfully higher bar than the test that this court has already affirmed multiple times in those other contexts because not only did the government need to prove intent to defraud and knowledge that his activities were unlawful, it also needed to prove intent to artificially control or affect a price and that there was no legitimate reason for Mr. Phillips to have traded in the way that he did. And that is basically a sole intent instruction. The defense has never really articulated what the meaningful daylight is between that instruction the district court gave and the instruction they're asking for or why any difference is necessary to protect any legitimate trading activity. I'd also add that the only argument for a sole intent instruction that Mr. Phillips has presented is basically a policy argument that, well, trading needs to have some type of extra protection, but there's no basis in law for that. I'd point out that it is common for innocent activity to be made unlawful by virtue of intent. A misstatement is not bad unless it has the intent to defraud. A gift to a politician is not a bribe unless there is an intent to influence that politician. An agreement between people is not a problem unless there is a criminal intent to make it a conspiracy. So trading is the rule that Judge Lyman articulated doesn't make trading any worse off than any other type of legitimate conduct that can be made unlawful. Thank you. Mr. Hecker, I'll give you two minutes. Four minutes I'll give you as that. Thank you, Your Honor. I appreciate it. On preservation, you're required to object and make sure the judge understands your objection. You're not required to bang your head against the wall. Judge Lyman exercised unbelievable deliberation and care in looking at these two issues. It was imminently clear that he understood our position and had rejected them. We were not required to object again. It would have been futile. There's no question in my mind it would have been futile. On the extent of the extraterritoriality provision, because I think the Court rightly understands that a reading of direct and significant that ropes in almost all trading that could connect to a swap, and to be clear, all foreign exchange trading in the spot market, which is wholly unregulated, ties up to some swap somewhere. And 60% of the prime brokerage relationships in the world are with a couple of the U.S. banks. So 60% would all, on the government's theory, come within this provision. And if it's a dollar-denominated spot trade, which almost all of them are, it would go through a U.S. bank. If it's 60%, why does that end the discussion? Supposing Congress didn't know it was going to be 60%. They just didn't know. They thought, my God, it's this little piece. But it turns out that the statute covers 60% of the trade. So what? Here's the thing, Your Honor. If the concept that Congress was getting at was that if there's some touchpoint with a U.S. financial institution that's good enough, they would have written the statute very differently. Congress knows full well how to write an extraterritoriality provision that turns on the identity of someone affected by the conduct. That's the FCPA. That's numerous statutes affecting U.S. persons or entities. It could have, but it didn't. It didn't, and the rule, the presumption against extraterritoriality tells you ambiguity gets read. There's another provision, I forget which provision it was, where they refer to systemic risk. So they clearly know how to put that in if they want to as well, right? Judge Lyman found that the effects prong of this same provision, that direct and significant in connection with the effects prong, means systemic risk, and that's why they didn't even argue that theory to the jury. He just gave a different interpretation of direct and significant when it came to talking about the in connection with activities in U.S. commerce provision. We think they should be read the same way. The two same adjectives should be read the same way in Section 2I. I just want to give you a minute on stalling time. Yeah, I appreciate that very much, Your Honor. This is really important, and it's of a piece with our rejected request that the court require an artificial price. This is an open market manipulation theory. This court over 30 years ago in Mulherin recognized the potential risk associated with those types of cases, and this one is worse. It's worse than all of the cases that were cited by the government because this one is open market trading in a wholly unregulated market, a market that Congress has decided not to regulate at all. These are legitimate trades. It is unlike the examples that the government gave just now where you can have a crime with no bad act. That's what this case would mean if you don't have a sole intent requirement and you don't require artificial price. Why? This is really important. The fraud here is that the trading sent a false signal to the swap counterparty, not to the spot market. The spot market, the government agrees that would not be a crime. It's to the swap counterparty. The only way for there to have been a false signal sent to the swap counterparty is if there was an artificial price created. Otherwise, it's not false. And the government wasn't required to prove sole intent, and they weren't required to prove up artificial price. The combination of those facts in this case creates a massive due process problem. These are legitimate trades in an open market, unregulated. What about the combination of sole intent and but-for, the but-for requirement? There's a really important distinction between but-for and sole intent. And I'll give you the best example possible. And first of all, let's be really clear. Judge Lyman understood there was a difference and got annoyed at me when I pressed him on trying to get to sole intent because he knew there was a difference. The difference would manifest in capturing in the but-for context. Agreed upon legitimate trading in the spot market, the best example would be what's called an iceberg order. In an iceberg order, a trader only shows the market a small portion of what it's actually bidding in the market. They're disguising the true amount of demand or supply. It's deceptive, but it's completely viewed as legitimate. The but-for instruction would capture that as problematic because you wouldn't have traded in the time and the manner in which you did or in the amount that you did, but for a desire to control the price, to avoid price movement or cause price movement. That is the distinction that makes all the difference in this unregulated market. People who trade in this industry know that. They know it clearly, and this Court has never rejected a sole intent instruction. The Court's danced around it. This is the case in which to require one. Can I ask you the simplest question that will be asked this week? Please. But I don't know the answer. If you're right, if you're right, do we reverse or do we reverse and remand? Does this go back to trial the way you suggested it should have been tried in the first place? I don't think that there would be any retrial. There couldn't be a retrial with the proper instruction in this case. It couldn't possibly be disputed that there wasn't a legitimate reason for the trading. Our client bought $100 million more. It shouldn't have been a trial in the first place. Absolutely should not have been a trial in the first place. All right. Thank you both. Thank you. Have a good day.